*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JASON MARK THOMPSON,

Defendant-Appellant.

UNPUBLISHED
July 21, 2026
10:33 AM

No. 370749
Oakland Circuit Court
LC No. 2022-281024-FC

Before: MARIANI, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of armed robbery, MCL 750.529. We affirm.

## I. BACKGROUND

Defendant's conviction stems from an armed robbery of a Speedway gas station in Rochester Hills. Stephen Wilder testified that he was working as an attendant at this gas station in the early morning hours of April 23, 2022. According to Wilder, at around 1:40 a.m., an individual entered the store with his face covered carrying a knife and demanded that Wilder "give him all the money; to open the register, and not to touch anything." Wilder did as the man said, and the man told Wilder "to step back," "not to touch anything, and to get on [his] hands and knees," and Wilder did as instructed. The man then emptied the register and left. Wilder estimated that there had been about $200 to $250 in the register in small-denomination bills. After the man left, Wilder hit the panic button, and he estimated that police arrived in "less than 30 seconds."

Deputy Mark Gilbert with the Oakland County Sheriff's Office responded to the call. Gilbert was permitted access to security footage of the robbery, and that footage was played for the jury at defendant's trial. Gilbert described how the video showed that the individual who robbed the Speedway was a black male wearing black boots with "a square toe," navy pants, a red hooded sweatshirt with a lighter lining, a gray undershirt, gloves, a mask, and a black knit cap.

Detective Bradley Reckling with the Oakland County Sheriff's Office testified that he was assigned as the officer in charge of the armed-robbery investigation on April 25, 2022. Reckling

explained that he began his investigation by reviewing the gas station's security footage, then canvassing the area "for additional video footage" to determine "where [the suspect] went." Based on the security footage from the gas station, Reckling determined that the suspect traveled from south to north to reach the gas station, then traveled south to leave, so Reckling requested footage from the business to the south of the gas station—Griffin Claw Brewing Company and Restaurant. Reckling reviewed Griffin Claw's security footage and saw an individual matching the description of the suspect walk across Griffin Claw's parking lot shortly before and after the robbery occurred. In Griffin Claw's security footage from after the robbery, the individual can be seen continuing to walk south.

The Red Roof Inn was about one-half mile south of Griffin Claw and Speedway. Reckling testified that he went to the Red Roof Inn on April 25 to review its security footage. Matthew Odish, the general manager of the Red Roof Inn in Rochester Hills, confirmed that he was contacted by a detective with the Oakland County Sheriff's Office on April 25, 2022, asking to review security footage. Odish complied and reviewed the footage with the detective. Juliana Zuraiqat-Parks, the operations manager for the Red Roof Inn in Rochester Hills, likewise confirmed that a detective came to the Red Roof Inn in April 2022 to review security footage in connection with an investigation into an armed robbery, and she testified that she reviewed the footage with the detective and Odish.

Reckling testified that the Red Roof Inn's security footage showed an individual matching the description of the suspect who robbed the Speedway leaving the hotel parking lot at around 1:22 a.m. on the night of the robbery. At defendant's trial, two videos depicting this individual walking through the Red Roof Inn's parking lot were played for the jury. A still image of this individual was taken from one video, and Reckling opined that, while the image was grainy, it showed that the individual was a black male wearing black shoes, blue pants, a long gray undershirt, and a red hooded sweatshirt with a gray liner. Reckling also emphasized the shape and style of the individual's beard shown in the video.

In another video that Reckling viewed from the Red Roof Inn, an individual—identified elsewhere as defendant—can be seen returning to the Red Roof Inn at 2:10 a.m. Reckling opined that defendant's beard in this video appeared similar to the beard of the individual shown leaving the Red Roof Inn at 1:22 a.m. Reckling also noted that, consistent with what the individual who was seen previously leaving the Red Roof Inn had been wearing, defendant was seen wearing a long gray shirt, blue pants, and black shoes. Reckling further noted that defendant appeared to be dropping dollar bills as he walked.[1] This video was also played for the jury. Reckling additionally viewed a video of a breezeway that showed defendant walk up stairs and then go to Room 249. This video was likewise played for the jury.

Odish testified that he recognized defendant in the video and confirmed that 249 was registered in defendant's name. Defendant was, according to Odish, placed in that room through "Lighthouse," which is a homeless shelter in Oakland County. Odish testified that Lighthouse provided food for its residents, but he was "not sure" if they provided clothing too. Zuraiqat-Parks,

---

[1] Zuraiqat-Parks testified that another guest at the hotel picked up the money the following morning.

on the other hand, testified that Lighthouse provided the individuals in Lighthouse's program with clothing "[i]f they needed it."

Reckling testified that after his initial review of the security footage, he advised Odish that he would need certain clips of the footage placed on a USB drive for the detective to take as evidence. Reckling then continued his investigation by canvassing the area between the Red Roof Inn and the Speedway. Reckling found in a drainage ditch near the Red Roof Inn a red hooded sweatshirt matching the one that the suspect was wearing in the video from the gas station. Near the sweatshirt, the detective also found a black knit hat. After collecting the red sweatshirt, officers found a mask in the sweatshirt's pocket. According to Reckling, the mask and the hat were sent for DNA testing, but not enough "quantity of human DNA was detected" to run a DNA analysis.

Detective Robert Davis with the Oakland County Sheriff's Office testified that he assisted in canvassing the area between the Red Roof Inn and the Speedway. After the red hooded sweatshirt was found, Davis canvassed "north and south" of the area "looking for any additional evidence." Davis's search found what looked like "a steak knife" in a wooded area just north of where the sweatshirt was found.

Reckling later returned to the Red Roof Inn to collect the USB from Odish. As Reckling was reviewing the videos a second time with Odish and Zuraiqat-Parks, defendant came into the lobby. Odish and Zuraiqat-Parks each confirmed that, while they were reviewing the security footage with the detective, defendant came into the lobby, and they identified him for the detective. Reckling testified that after confirming defendant's identity, Reckling arrested him.

After defendant's arrest, Reckling obtained a search warrant for Room 249. In the room, Reckling found blue pants appearing to match the pants that the suspect was wearing on the night of the robbery, as well as black, square-toed dress boots appearing to match the boots that the suspect was wearing on the night of the robbery. Officers also found a package of black gloves that "appeared to match the description of the gloves that the suspect was wearing . . . at the time of the robbery." The package indicated that it was a "two-pack" of gloves, and one set was missing.

At defendant's trial, Reckling testified about how he brought together all of the evidence that he collected. Reckling compared still shots from the video of defendant returning to his room in the early morning hours of April 23, 2022, to still shots from the video of the armed robbery at the gas station, observing several similarities between what defendant was wearing and what the culprit in the armed robbery was wearing. Reckling noted that both were wearing similar colored pants, black square-toed dress shoes with laces that went above the pant line, and gray shirts that hung below the waistline. When shown images of the boots and pants recovered in defendant's room next to an image of the suspect in the armed robbery, Reckling testified that the pants and boots depicted in each image appeared to match what defendant was wearing at the time of the robbery. Reckling also compared a close-up profile of the suspect to a picture of defendant's profile and noted that "[t]he beard profile" of both were similar, as was the "flat" nose.

The central issue at defendant's trial was whether defendant was the individual who committed the armed robbery. The jury found that he was and convicted him as stated above.

This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant first challenges whether the prosecution's evidence was sufficient to support that defendant was the individual who robbed the Speedway gas station in Rochester Hills in the early morning hours of April 23, 2022.

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).

When considering a sufficiency-of-the-evidence claim, this Court views the evidence in the light most favorable to the prosecution to "determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Lowrey*, 342 Mich App 99, 122; 993 NW2d 62 (2022) (quotation marks and citation omitted). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn from that evidence, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction. *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002). "Circumstantial evidence and reasonable inferences arising therefrom" can, standing alone, be enough to satisfy the proof-beyond-a-reasonable-doubt standard. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence" and what weight, if any, those inferences should "be accorded." *Hardiman*, 466 Mich at 428.

Defendant does not dispute that an armed robbery occurred; he disputes only whether the prosecution presented sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that defendant was the individual who committed the offense. Identity is an element of every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Defendant is correct insofar as he stresses that there was no direct evidence identifying him as the individual who committed the armed robbery at issue in this case—the prosecution's case against defendant relied entirely on circumstantial evidence. But that circumstantial evidence was, frankly, overwhelming.

It is undisputed that, at the time of the robbery, defendant was staying at the Red Roof Inn. The Red Roof Inn was approximately one-half mile away from the Speedway that was robbed. The prosecution presented video of an individual leaving the Red Roof Inn at 1:22 a.m. on the night of the robbery wearing a red hooded sweatshirt with a gray lining, a gray undershirt that hung below the waistline, blue pants, and black shoes. That same individual was later captured by a security camera outside of Griffin Claw—which is directly next to the Speedway—walking towards the Speedway gas station, coming from the direction of the Red Roof Inn. In the video of the robbery that the prosecution showed to the jury, the individual who committed the robbery can be seen wearing the same clothing—a red hooded sweatshirt with a lighter-colored lining, blue pants, black square-toed shoes, a gray undershirt hanging below the waistline, a black knit hat, and dark gloves. The timestamp from the video shows that it occurred at around 1:40 a.m. The gas-station video ended with the individual walking back towards Griffin Claw, and Griffin Claw's security footage showed the individual continuing in the direction of the Red Roof Inn. In a drain

-4-

ditch near the Red Roof Inn between the Speedway and the hotel, officers found a red hooded sweatshirt with a gray lining and a black knit cap. Security cameras at the Red Roof Inn recorded defendant returning to his room at 2:10 a.m. on the night of the robbery wearing black square-toed boots, blue pants, and a gray shirt that hung below his waistline, all of which was consistent with what the individual who robbed the Speedway was wearing, absent the sweater, hat, and gloves. Also, in the video, defendant appears to be dropping dollar bills as he is walking, and the gas station clerk who was robbed testified that, in the till that was emptied, there were only small-denomination bills adding up to $200 or $250. Officers later executed a search warrant of defendant's room, where they recovered blue pants and black square-toed boots consistent both with what defendant was wearing on the night of the robbery and with what the individual who robbed the Speedway was wearing. Officers also found packaging for a two-pack of black gloves with only one pair of gloves still in the packaging. In addition, Griffin Claw's security cameras captured the profile of the individual who robbed the gas station, and it appears from that profile that the individual had a flat nose and full beard, which was consistent with defendant's profile as shown in a photo of defendant taken a few days after the robbery.

While none of this evidence directly proved that defendant was the individual who robbed the Speedway, it is ample circumstantial evidence to that effect. Considering this circumstantial evidence and the reasonable inferences that can be drawn from it in the light most favorable to the prosecution, a rational trier of fact could easily find beyond a reasonable doubt that defendant was the individual shown in the video robbing the Speedway gas station on April 23, 2022.

## III. FAILURE TO PRESERVE EVIDENCE

Defendant next argues that his due process rights were violated because law enforcement officers did not collect and preserve all of the security footage from the Red Roof Inn and from a Days Inn near the Speedway.

Defendant failed to raise this objection below, so the issue is unpreserved. See *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). Unpreserved claims of constitutional error are reviewed for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). To be entitled to relief under the plain-error standard, the defendant must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the lower court proceedings. *Id*. at 763.

The Fourteenth Amendment of the United States Constitution protects the due process rights of criminal defendants. US Const, Am XIV. A defendant's due process rights are violated if the government suppresses material exculpatory evidence, regardless of whether the government was acting in good faith or bad faith. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). But "the Due Process Clause requires a different result" when the issue is "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been" exculpatory. *Arizona v Youngblood*, 488 US 51, 57; 109 S Ct 333; 102 L Ed 2d 281 (1988). In such cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58. Because "police have no affirmative duty to gather or help gather evidence for an accused," *People v Anstey*, 476 Mich 436, 462; 719 NW2d 579 (2006) (quotation marks and citation omitted), the government's constitutional duty to preserve evidence generally does not

extend to potentially exculpatory evidence that was never in the government's possession. See *Champ v Zavaras*, 431 Fed Appx 641, 648 n 5 (CA 10, 2011) ("[T]he State cannot be said to have a duty to preserve evidence that is only *potentially exculpatory* within the meaning of *Youngblood*, where there is no showing that the State ever possessed the evidence.").

It is undisputed that the government never possessed the footage from the Days Inn or the Red Roof Inn that defendant claims the government failed to preserve. Given this, defendant has not presented a valid *Youngblood* claim because it cannot be said that the government failed to preserve evidence that it never possessed. The Due Process Clause does not impose a duty on the government to preserve potentially exculpatory evidence that the government never possessed. *Champ*, 431 Fed Appx at 648 n 5.[2] Imposing such a duty would make little sense considering that the government does not have an affirmative duty to seek and find potentially exculpatory evidence in the first place. See, e.g., *People v Sawyer*, 222 Mich App 1, 6; 564 NW2d 62 (1997) ("Inasmuch as defendant intimates the police deprived him of his right to due process by failing to discover certain alleged exculpatory evidence, we note the police are not required to seek and find such evidence."); *People v Miller (After Remand)*, 211 Mich App 30, 43; 535 NW2d 518 (1995) ("The police are not required to seek and find exculpatory evidence."). Defendant has accordingly failed to identify a plain error.

IV. INVADING THE PROVINCE OF THE JURY

Defendant next argues that Reckling improperly invaded the province of the jury when the detective positively identified defendant as the individual who robbed the Speedway. Alternatively, defendant argues that his trial counsel provided constitutionally deficient assistance when he failed to object to Reckling's improper testimony.

A. SUBSTANTIVE CHALLENGE

Defendant did not object to Reckling's challenged testimony below, so his substantive challenge to that testimony is unpreserved. *People v Thorpe*, 504 Mich 230, 253; 934 NW2d 693 (2019). Unpreserved claims are reviewed for plain error. *Carines*, 460 Mich at 764. To be granted relief under the plain-error standard, a defendant must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the lower court proceedings. *Id*. at 763.

The parties' dispute on this issue centers around two cases: *People v Fomby*, 300 Mich App 46; 831 NW2d 887 (2013), and *People v Perkins*, 314 Mich App 140; 885 NW2d 900 (2016), vacated in part on other grounds by *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016), rev'd in part on other grounds by *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018). Both cases concerned testimony by police officers identifying individuals in still photos and surveillance footage, and the issue in each case was whether the officer's testimony improperly invaded the

---

[2] Assuming for the sake of argument that the government had a duty to collect and preserve this evidence, defendant has failed to establish that the government acted in bad faith when it failed to preserve the security footage that the government never possessed.

province of the jury. Both opinions clarified that such testimony constituted lay opinion testimony generally admissible under MRE 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception; and
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue. [See *Fomby*, 300 Mich App at 53; *Perkins*, 314 Mich App at 161.]

In *Fomby*, Sergeant Ron Gibson testified about the identity of individuals in still photos and surveillance footage as follows:

> Gibson's testimony identified individuals depicted in still-frame photos— taken from the surveillance video—as the same individuals in the actual video. The purpose was to determine whether the two suspects involved in the shooting and whose images were captured in the surveillance video had been to the BP gas station before the murder. Gibson explained what he was trying to capture in each of the six still photographs. Each photo captured specific individuals: the suspects, the victim, or a woman whom Gibson saw accompanying the two suspects earlier in the evening of the murder. When asked about the surveillance video, Gibson identified the victim, the suspect who had a shotgun, and the suspect who was holding the victim. Gibson identified Exhibit 4 as a still photo depicting the person in the video who was holding the shotgun and Exhibit 9, another still photo from the video, as depicting the person grasping the victim. Gibson never testified that any of the individuals depicted in either the still photographs or the surveillance video was defendant. [*Fomby*, 300 Mich App at 49.]

On appeal, this Court explained that this testimony was admissible under MRE 701 because it "was (1) rationally based [on Gibson's] own perception of the video and (2) helpful for the jury to determine whether the two individuals seen committing the crime in the surveillance video had come to the BP gas station earlier in the evening." *Id*. at 53. The defendant insisted that Gibson's testimony invaded the province of the jury, but the *Fomby* Court rejected that argument, explaining that "Gibson did not identify defendant in the video or still image," and his "testimony only linked individuals depicted in the surveillance video as being the same individuals depicted in the still photographs." *Id*.

In *Perkins*, Officer Terence Green was asked to give his opinion about "certain video footage and still frames from the stairwell of the apartment building where the murder occurred" in the following exchange:

> *Q*. Camera two. Okay. . . . can you tell us who is coming down these stairs when you can see them?
>
> *Mr. Skinner* [defense counsel]: I'm gonna object to that question.

*By Ms. Hanson* [prosecutor]:

*Q.* Who is that?

*A.* That's Kenya Hyatt.

*Q.* Okay.

*Mr. Skinner*: Judge, can I be heard?

*The Court*: I'm hearing you.

*Mr. Skinner*: All right. It's too late now for my objection.

*The Court*: Well, I'm gonna overrule the objection. But you can make a separate record at a later time. [*Perkins*, 314 Mich App at 160-161.]

This Court held that this testimony invaded the province of the jury because "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo was a determination properly left to the jury," and there was "no reason to believe that" Green "was more likely to identify correctly the person than is the jury." *Id.* at 161. "There was nothing about the images (i.e. poor quality of the images, defendant wearing a disguise) that necessitated Green's opinion," the *Perkins* Court added. *Id.* at 162. This Court nevertheless concluded that the error in admitting Green's improper testimony was harmless because "evidence of Hyatt's guilt was overwhelming," and Hyatt's identity was largely "not at issue." *Id.* at 162-163.

Turning to defendant's arguments in this case, we agree with the prosecution that two portions of Reckling's testimony that defendant challenges on appeal were not identification testimony. First, defendant challenges Reckling's testimony about what the jury should pay attention to in a video of defendant walking through the parking lot of the Red Roof Inn. As the prosecutor was preparing to play the video of defendant walking through the Red Roof Inn's parking lot, he confirmed with Reckling that the timestamp in the video would reflect that the events depicted took place about one-half hour after the robbery at the Speedway, and then the following exchange occurred:

*Q.* Now what should the jurors be looking for as we play this video, sir?

*A.* The—the same beard profile, you will—you will see in the right-hand of the screen, as the individual walks from the north to the south, you'll see the gray shirt, undershirt that was worn underneath the red zip-up sweater, the blue pants, and the black shoes.

The video of defendant walking through the parking lot of the Red Roof Inn was then played for the jury. This testimony cannot reasonably be construed as Reckling identifying defendant as the individual who robbed the Speedway. Nor, as a general matter, was anything about Reckling's challenged testimony improper. Reckling merely highlighted what he rationally perceived defendant to be wearing in the video reviewed by Reckling, and how that matched what the individual who robbed the Speedway was wearing. The video of defendant walking through the

Red Roof Inn parking lot was clipped from security footage and, as such, was not particularly clear. Reckling presumably reviewed that video multiple times and scrutinized it in order to come to his conclusions. Reckling highlighting aspects of the video that the jury should pay attention to was clearly helpful for the jury's understanding of why this evidence was relevant. Nothing about Reckling's testimony in this respect invaded the province of the jury.

Second, defendant challenges Reckling's testimony about the similarities between the boots found in defendant's room and the boots that the individual who robbed the Speedway was wearing, which likewise cannot reasonably be construed as identification testimony. The prosecutor asked Reckling about a close-up picture of the boots found in defendant's room at the Red Roof Inn and a zoomed-in picture of the boots that the individual who robbed the Speedway was wearing, and the following exchange ensued:

> *A.* This [exhibit] is a close-up of the boots showing that the—the squared-toe, the shininess, and the eyelets of the boots.

> *Q.* Sir, did you form an opinion as to whether or not these boots are consistent between those that were observed at the Speedway, and those that were recovered from Mr. Thompson's room?

> *A.* I believe they were one in the same.

Reckling obviously did not identify defendant as the individual who robbed the Speedway in this exchange. Reckling was instead comparing the boots that were found in defendant's room to still images of the boots that the individual who robbed the Speedway was wearing on the night of the robbery and noted the similarities between them. Then, based on those similarities, Reckling opined that the boots found in defendant's room were the same as the ones that the individual who robbed the Speedway was wearing. Beyond their color, the similarities between the boots found in defendant's room and the ones that the individual who robbed the Speedway was wearing are not immediately apparent. Reckling's opinion about the similarities between the two—which presumably came after Reckling spent time scrutinizing images of both sets of boots—was helpful to the jury identifying possible similarities between the boots. And given Reckling's time investigating this case and scrutinizing the evidence—particularly the grainy still image of the boots that the individual who robbed the Speedway was wearing—Reckling was in the best position to identify whether the boots found in defendant's room were the same as the ones that the individual who robbed the Speedway was wearing. See *Fomby*, 300 Mich App at 53 (explaining that, given what went into Gibson's investigation of the videos and still photographs, "Gibson was in the best position to identify the individuals in the photographs as being the same as those depicted in the video"); *Perkins*, 314 Mich App at 162 (identifying "poor quality of the image[]" as a reason why it may be proper for an officer to opine on what an image depicts). For these reasons, we agree with the prosecution that Reckling's challenged testimony about the boots did not amount to plain error.

Defendant's challenge to Reckling's testimony concerning side-by-side images of items found in defendant's room and images of the individual who robbed the Speedway presents a closer question as to whether Reckling identified defendant as the individual who robbed the Speedway. During the challenged exchange, Reckling was asked about two exhibits that each had

two images side-by-side—one exhibit ("People's 43") showed the pants found in defendant's room next to an image of the individual who robbed the Speedway, and the second exhibit ("People's 45") showed the boots found in defendant's room next to an image of the individual who robbed the Speedway. The prosecution showed each exhibit to the jury during the following exchange with Reckling:

> *Q.* Forty-three?
>
> *A.* The blue pants that were found in the room—
>
> *Q.* And—
>
> *A.* –and that Mr. Thompson was wearing at the time.
>
> *Q.* And that's the image that's depicted on the right-hand for the record, and the image on the left-hand is the entry to the Speedway?
>
> *A.* Correct.
>
>     * * *
>
> *Q.* People's 45?
>
> *A.* It's the dress boots that were recovered from Room 249 at the Red Roof Inn that was registered to Jason Thompson, and the boots that Jason Thompson was wearing at the time of the robbery.

One can reasonably interpret Reckling's answers in this exchange as discussing only the items found in the room and what defendant was wearing on the night of the robbery, and not as identifying defendant as the individual depicted in the image who robbed the Speedway. Through Reckling, the prosecution presented other evidence (namely videos and still images of defendant returning to his room on the night of the robbery) establishing that, roughly when the robbery occurred, defendant was wearing blue pants and black square-toed boots. And Reckling's disputed testimony could be reasonably interpreted as Reckling commenting only on one image in the exhibit—the pants and shoes found in defendant's room, which matched what defendant was wearing on the night of the robbery. This interpretation of Reckling's testimony is particularly plausible for the exhibit depicting the blue pants given the prosecutor's follow-up question. When the prosecutor asked about "People's 43," Reckling testified that it depicted "[t]he blue pants that were found in the room . . . and that Mr. Thompson was wearing at the time," and the prosecutor followed up by clarifying "that's the image that's depicted on the right-hand for the record," and Reckling responded, "Correct."

Juxtaposing images of the items found in defendant's room next to images of the individual who robbed the Speedway wearing similar items was, of course, intended to emphasize the items' similarities. And Reckling's testimony that, on the night of the robbery, defendant was wearing those items found in his room while the jury was looking at images depicting the individual who robbed the Speedway wearing similar items drove home the point that defendant and this unidentified individual were wearing similarly colored pants and remarkably similar boots on the

-10-

night of the robbery. But the fact remains that Reckling's disputed testimony can fairly be read as testifying only about the items found in defendant's room that defendant had been wearing on the night of the robbery, not testifying about whether the image depicting the individual who robbed the Speedway was an image of defendant. Because that is so, it is neither clear nor obvious that Reckling's challenged testimony invaded the province of the jury. Defendant therefore cannot satisfy the plain-error standard.

## B. INEFFECTIVE ASSISTANCE

Whether defendant was denied the effective assistance of counsel ordinarily presents a mixed question of fact and law—the legal issues are reviewed devo while the factual findings are reviewed for clear error. *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). But where, as here, no evidentiary hearing was held, there are no factual findings to which this Court must defer, and whether defendant was denied the effective assistance of counsel is a question of law, reviewed de novo based solely on the record created below. *Id*.

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). When reviewing counsel's performance, decisions born from sound trials strategy should not be deemed unreasonable, even if the strategy does not succeed. See *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). Appellate courts should refrain from second-guessing strategic decisions "with the benefit of hindsight." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

As explained earlier, it is debatable whether Reckling's testimony was improper, and defendant's trial counsel may have made the strategic decision to not object because it would only draw attention to issues harmful to defendant. See *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995) (explaining that "there are times when it is better not to object and draw attention" to an issue or comment harmful to defendant's case); *Unger*, 278 Mich App at 253 "Declining to raise objections can often be consistent with sound trial strategy."). If counsel objected to Reckling's unclear testimony, Reckling could have simply clarified that he was not saying that the image of the individual who robbed the Speedway was defendant, only that defendant was wearing blue pants and black square-toed boots on the night of the robbery, and those blue pants and black square-toed boots were later found in defendant's room, as shown in the exhibit. And while Reckling was clarifying that defendant, on the night of the robbery, was wearing the blue pants and black square-toed boots found in his room, the jury would be seeing the image of the individual who robbed the Speedway wearing blue pants and black square-toed boots. It is therefore not a stretch to imagine that defendant's trial counsel made the strategic decision to not have the jury dwell on Reckling's vague testimony and run the risk of highlighting evidence that was damaging to defendant's case.

But even if counsel should have objected, there is not a reasonable probability that the outcome would have been different if counsel did so. Reckling was the lead investigating officer on this case, and he sat at the prosecutor's table all through trial. Surely the jury could infer from these facts alone that Reckling believed that defendant was the individual who robbed the Speedway, and hearing Reckling indirectly say as much in passing likely had no impact on the

-11-

jurors' consideration of the facts. This is especially likely when combined with the trial court's instruction that it was the jury's responsibility alone to decide the facts, and the jurors were free to disbelieve any person's testimony.

More importantly, while identity was the main issue in this case, the evidence on that point was overwhelming. Defendant was staying at the Red Roof Inn on the night of the robbery. The individual who robbed the gas station left the Red Roof Inn at around 1:22 a.m. wearing a red hoodie, a gray undershirt that fell below the waistline, a black hat, dark gloves, blue pants, and black square-toed boots. Later images of this individual's profile showed that they had a beard. About 30 minutes after the robbery, defendant—who had a beard at the time—can be seen walking through the Red Roof Inn parking lot wearing a gray shirt that fell below his waistline, blue pants, and black square-toed boots. The cashier who was robbed testified that there were only small-denomination bills in the cash register, and defendant can be seen dropping bills as he walked through the parking lot back to his hotel room on the night of the robbery. While defendant was not wearing a red hoodie or black hat at the time, those items were recovered in a drainage ditch between the Red Roof Inn and the Speedway gas station. A search of defendant's room subsequently found blue pants, black square-toed boots, and one pair of black gloves that came in a two-pack, with the second pair missing. Taking all of this evidence together, the circumstantial evidence tending to establish that defendant was the individual who robbed the Speedway gas station was overwhelming. There is not a reasonable probability that the jury would have found that defendant was not the individual who robbed the Speedway had his trial counsel objected to Reckling's vague identification testimony.

## V. RIGHT TO PRESENT A DEFENSE

Defendant next contends that the trial court denied defendant the right to present a defense when it sustained the prosecutor's objection to a portion of defendant's closing argument.

Whether a defendant was denied the constitutional right to present a defense is reviewed de novo. *People v Unger*, 278 Mich App 210, 247; 749 NW2d 272 (2008).

Defendant takes issue with the trial court sustaining the prosecution's objection to the following argument that defendant's trial counsel made during closing:

> What we found out from Ms. Parks is that—and she knows the residents better than Mr. Odish does, she told you that—30 to 40 residents in that complex, those two buildings together, are Lighthouse residents.
>
> Now, when Lighthouse provides clothing to people who need it, do you think that they give everyone a different color pair of pants?

Defendant contends that sustaining an objection to this argument was error because defendant's "trial counsel should have been permitted to argue that other Lighthouse residents may also have been given the similar, generic clothing that the robber was wearing that was attributed to [defendant]." Defendant later reiterates that "either he could argue that Lighthouse provided similar clothing to the residents, or he couldn't. And here, he couldn't."

-12-

Regardless of whether the trial court was correct to sustain the prosecutor's objection, defendant is not entitled to relief because he was able to make the very arguments that he contends that he should have been able to make. Almost immediately after the prosecutor's objection was sustained, defendant's trial counsel made the following argument:

> We know that they provide clothing. We know that. So use your common sense in making a determination as to whether or not they provide different colored clothing to every resident that—every resident that is there that's getting clothing, and boots, or hats, gloves, t-shirts. Do you think everybody gets their own color? No. That doesn't make any sense.

Later, when arguing that the prosecution's evidence was insufficient to establish that defendant was guilty beyond a reasonable doubt, defendant's trial counsel argued that "[m]aybe one of the 30 to 40 residents of the Red Roof Inn were given the same boots, pants, and t-shirt. That's a logical possibility. But they didn't give us an answer to that question. They didn't rule out that possibility."

This demonstrates that contrary to defendant's contention on appeal, his trial counsel was permitted to highlight the possibility that Lighthouse provided similar clothing to its residents staying at the Red Roof Inn, with the implication being that defendant's wearing clothing similar to that worn by the individual who robbed the Speedway was not fatal because it was possible that Lighthouse provided such clothing to all of its residents at the Red Roof Inn. Defendant's contention that he was prevented from presenting a defense is thus belied by the record, which affirmatively demonstrates that defendant was able to make the very arguments he claims he was prevented from making. There is accordingly no basis to conclude that the trial court deprived defendant of his right to present a defense when the court sustained the prosecutor's objection to defendant's trial counsel's closing argument.

## VI. REFERRING TO JURORS BY NUMBERS

Defendant lastly argues that his due process rights were violated when the trial court empaneled an anonymous jury.

This argument is misleading because an anonymous jury was not empaneled—the trial court referred to jurors by numbers, which does not necessarily make a jury anonymous. As this Court has repeatedly explained, an "anonymous jury" is "one in which certain biographical information is withheld from the parties." *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). See also *Hanks*, 276 Mich App 93 (stating that this is how "[t]his Court" has "defined" the term "anonymous jury"); *People v Lewis*, ___ Mich App ___, ___; ___ NW3d ___ (2026) (Docket No. 368179); slip op at 2. Defendant concedes on appeal that jurors' biographical information was not withheld from the parties. Therefore, an anonymous jury was not empaneled.

Defendant is instead trying to import principles that apply when a court empanels an anonymous jury to cases like this one where the trial court refers to jurors by numbers—defendant contends that referring to jurors by numbers presumptively prejudices a defendant in the same way that empaneling an anonymous jury does. But this precise argument was considered and rejected by this Court over two decades ago in *Williams*. There, this Court addressed a scenario in which

a trial court did not withhold jurors' biographical information but still referred to jurors by numbers, and it concluded that because nothing suggested "that jurors understood the use of numbers rather than names to be anything out of the ordinary," there was "no reason to presume prejudice from the trial court's actions here." *Williams*, 241 Mich App at 524-525.

Here, likewise, there is nothing to suggest that the jurors understood the use of numbers rather than names to be anything out of the ordinary. Therefore, like in *Williams*, there is no reason to presume that defendant was prejudiced by the trial court's referring to jurors by numbers. See *id*. at 525.

Without a presumption of prejudice, the burden rests with defendant to prove that the trial court's referring to jurors by numbers prejudiced him. See *id*. at 523-524; *Hanks*, 276 Mich App at 94; *Lewis*, ___ Mich App at ___; slip op at 3. Defendant contends that he was prejudiced because his presumption of innocence was compromised, but defendant points to nothing in the record in support of this contention. Defendant has therefore failed to carry his burden of establishing that his presumption of innocence was compromised and is accordingly not entitled to relief. See *Williams*, 241 Mich App at 523-524; *Hanks*, 276 Mich App at 94; *Lewis*, ___ Mich App at ___; slip op at 3.

Affirmed.

/s/ Philip P. Mariani
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace